Tueley, J.
delivered the opinion of the court.
This bill is filed by the complainants, who are held in slavery by the defendants, to have their freedom declared, which they claim as their right under the will of Abram Earhart, made and published in the State of North Carolina on the 28th day of November, 1812.
The third and fourth clauses of that will are in the words following: “ After the death of my wife Catherine. Earhart, I allow my executors, at the expense and charge of my estate, to use their endeavors to have the whole of my negroes and their increase removed into the State *598 of Ohio, and set free agreeable to the laws of said State, and in case that cannot be accomplished, I will the whole of said negroes and their increase to my brother Phillip Earhart and his children to be divided equally between them.” After the death of Catherine Earhart, in the State of North Carolina, the executors of the will of Abram Earhart, instead of removing the slaves to the State of Ohio for the purpose of having them emancipated, according to the provisions of the will, chose to consider that they passed by it to Philip Earhart, and his children, to whom as devisees they were delivered by the executors.
The complainants are these slaves and their descendants, who have been removed into the State of Tennessee, and sold to the defendants, against whom, together with the executors of the will who are non-residents, this bill is filed.
The only question presented for our consideration is, whether, under the construction of this will, these slaves are free. In the case of Reuben et als. vs. Parrish, 6 Hum., 122, the court held, that if slaves are directed to be emancipated in another State, and the direction be not of itself an emancipation, but there is some act to be done before the emancipation is complete, they cannot be brought to this State, and ask to have that act done by our courts for the purpose of perfecting the emancipation; but if the direction of emancipation be of itself a complete emancipation, by the laws'of the State where it is made, we will declare them to be free here. This, in our opinion, still, is the correct rule of exposition in such cases; and it presents directly for our consideration, the question as to whether these complainants are freed from slavery directly under the provisions of the will of Abram Earhart, according to the laws of North Carolina or not? We are constrained *599 to hold that they are not; for by the law of North Carolina, as expounded by the highest judicial tribunal, the Supreme Court of Errors and Appeals, at the date of this will, and subsequently, up to the time these complainants were delivered up by the executors of the will as slaves, and their removal to the State of Tennessee no emancipation could be effected of slaves, in the manner provided for in this will: it was considered as contrary both to the law and policy of the State. See the reported cases of the decisions upon this point in 2 Murphy, 354; 2 Hawks., 120, 613; 1 Dev. Eq., 493; 1 Dev. and Battle, 260; 2 Dev. Eq., 437: the principle is well settled and not seriously controverted. Indeed, the testator himself seems to have been aware, that his negroes could not be emancipated under his will in the State of North Carolina ; he does not attempt to emancipate them, but instructs his executors to remove them into the State of Ohio, and set them free according to the laws of that State; and he seems to have been apprehensive that it might be impracticable to effectuate this intention; for he provides that if it cannot be accomplished, the whole of his negroes and their increase shall be equally divided between his brother Philip and his children.
The testator seems to have supposed that, in the free State of Ohio, some provision might exist by which slaves might be carried there and emancipated, but Ohio has not thought proper to enact any law for such purpose : she has found it necessary, on the contrar}', to protect herself against becoming a sanctuary for slaves and free negroes. Accordingly, by an act, passed on the 5th day of January, 1804, it is provided, “that from and after the 1st day of June, next ensuing, no black or mulatto person shall be permitted to settle or reside in that State, unless *600 he or she shall first produce a fair certificate, from some court in the United States, of his or her actual freedom, which certificate shall he attested by the clerk of said court, and the seal thereof annexed thereto, by said clerk.’’ Statutes of Ohio, 592.
And by an act, passed on the 25th day of January, 1807, it is further provided, “ That no negro or mulatto person shall be permitted to emigrate into, and settle within, the State, unless such negro or mulatto person shall, within twenty days thereafter, enter into bond, with two or more freehold sureties, in the penal sum of five hundred dollars before the clerk of the Court of Common Pleas, of the county in which said negro or mulatto may wish to reside, conditioned for the good behavior of such negro or mulatto, and moreover to pay for the support of such person in case he, she, or they should thereafter be found within any township in the State, unable to support themselves.” Statutes of Ohio, 593.
We thus see what obstacles were thrown in the way of the executors, in any attempt to carry into effect the provisions of the will, which directed them to take these slaves to Ohio to be there emancipated. That State so far from having passed any law in relation to the emancipation of slaves brought there, had absolutely prohibited their introduction within its limits as residents, and had even gone so far as to require from every free negro or mulatto, before he or she should be permitted to become a resident of the State, to enter into a bond, with a penalty of five hundred dollars, with at least two freehold securities conditioned for his or her good behavior, and for the payment of his or her support, in case he or she should be found in any township in the State, unable to support him or herself.
*601 Then here is a law prohibiting the introduction of slaves, and' almost prohibiting the introduction of free persons ©f color; certainly so, in most cases where a large number of slaves are manumitted in another State to be sent to Ohio. Twenty, thirty, forty, or more strange free persons of color, are introduced into the State for the purpose of becoming residents, each one of whom has to enter into bond, as above stated, with two freehold sureties of the State — how are these bonds to be procured ? Fifty bonds, of five hundred dollars each, make twenty-five thousand dollars. There is perhaps not an executor of a will, by which fifty slaves are directed to be manumitted and removed to that State, who could procure such bonds. The Legislature of Ohio well knew that bonds to such an extent could seldom, if ever, be given, and the law was no doubt intended to prevent an influx of emancipated slaves from other States.
The executors, in the case under consideration, allege these things in defence of themselves for having neglected to obey the instructions of the will in this particular, and we think very properly. The negroes as slaves could not have been legally introduced into the State of Ohio there to be emancipated; they could not, as free men, have been introduced into the State, without the bonds required, and it is obvious that these North Carolina executors could not have procured these bonds.
But it is said that by what may be called the common law of Ohio, a slave, who is carried there voluntarily by his owner, is ipso facto free; and that it was the duty of these executors to have carried these slaves upon the soil of that State, whereby they might become free, though they were immediately to. be expelled from its borders for want of the bonds required by law. We do not so *602 consider it. It was not the duty of the executors to have carried these slaves to the State of Ohio under the existing circumstances. They were not called upon to violate the laws of the State. The testator did not contemplate such an act; he looked to a legal emancipation in the State of Ohio, and. a quiet, peaceful residence for them there. He never desired a mere emancipation of his slaves to be brought about by touching the soil of Ohio, and for them to be immediately thrust forth to wander upon the face of the earth without a resting place: on the contrary, in anticipation of such difficulties he devises them to his brother and his children.
But a greater difficulty than all this, is in our way. Even supposing that by a bare removal of the negroes to the State'of Ohio all the consequences assumed would have followed, and that it was the duty of the executors so to have removed them ; nevertheless, this they have not done, and until it be done the negroes are not free ; for it is the standing upon Ohio soil that consummates their freedom, and of necessity until they can so stand, they are not free. The executors refuse or neglect to take the initiatory steps to produce this consummation. Can this court compel them to do so? Certainly not according to the principles of the decision of Reuben et als. vs. Parrish, 6 Hum., 122, above referred to. The will is a North Carolina will; the executors are non-residents, and we, therefore, have no power over them.
But it has been argued, that if it be the duty of the executors to have carried these slaves to the State of Ohio for their emancipation, this court should consider it as done, upon an old and well settled principle of equity that that which is directed to be done shall be considered as done. This principle is a true and wise one in relation *603 to the subjects to which it applies, but we cannot extend it so far as to hold, that if an executor be instructed to carry a slave to a free State to be emancipated, he shall be considered to have done so, though he never has and refuses. We do not comprehend how we could so hold. Wé do not see any similitude between such a case, and those to which the principle does apply.
We are constrained to hold' that the complainants are not emancipated by the will under which they claim their freedom; and affirm the decree of the Chancellor, dismissing their bill.